SOUTHERN UNION PRODUCTION
COMPANY and Aztec Oil & Gas
Company, Plaintiffs-Appellants,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Administrator, Federal Energy Administration, Defendants-Appellees.

No. 5–26.

Temporary Emergency Court of Appeals.

Argued Sept. 22, 1977.

Decided Jan. 31, 1978.

**1148**

Robert W. Jordan, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., with whom Morris Harrell, Dallas, Tex., was on the brief, for plaintiffs-appellants.

Bruce G. Forrest, Dept. of Justice, Washington, D.C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Gerald D. Freed, Washington, D.C., were on the brief, for defendants-appellees.

Before CHRISTENSEN, JAMESON and GRANT, Judges.

PER CURIAM:

In this action, seeking injunctive and declaratory relief, appellants, who are the producers of gas well condensate, challenge the regulation of condensate by the Federal Energy Administration (FEA). They contend that (1) the FEA lacks authority under the Emergency Petroleum Allocation Act of 1973, as amended (EPAA),[1] to regulate the pricing and allocation of condensate recovered from natural gas wells;[2] and (2) if it does have this authority, FEA has acted in excess of its authority, and arbitrarily and capriciously, in excluding gas well condensate from the stripper exemption mandated by the Allocation Act. 15 U.S.C. § 757(i) (Supp.1977).[3] In particular, appellants challenge FEA ruling 1974-28, 39 Fed.Reg. 44414 (1974), in which the FEA confirmed its determination that the exemption was not applicable to liquid hydrocarbons produced from gas wells. On cross-motions for summary judgment, the district court granted the motion of appellees. We affirm.

■ This is the third case before this court challenging the FEA's authority to regulate the allocation and pricing of certain hydrocarbons known as "natural gas liquids" recovered from natural gas wells. In both *Mobil Oil Corp. v. FEA,* 566 F.2d 87 (Em.App.1977) and *National Helium Corp. v. FEA,* 569 F.2d 1137 (Em.App.1977) we affirmed summary judgments upholding the FEA's assertion of regulatory jurisdiction. We have addressed the question of FEA authority at length in those decisions. In *Mobil* we examined the statutory terms in the light of the broad objectives of the Act, the legislative history, concomitant administrative actions, and subsequent legislation. We concluded that the FEA had properly exercised its statutory authority in adopting a regulatory framework to control the price and allocate the supplies of all natural gas liquids, including condensate.

While *Mobil* was concerned with other natural gas liquids as well as condensate, jurisdiction over condensate produced from natural gas wells was specifically contested. Our opinion in *Mobil* likewise considered condensate separately. We found no sound

---

1. Pub.L. No. 93–159 (1973) (15 U.S.C. § 751 *et seq.*).

2. Condensate exists as a natural gas in the underground reservoir and is condensed from the gas and recovered as a liquid. Crude oil and natural gas are often found in the same geological formation. Condensate extracted from wet natural gas produced at an oil well is termed "associated"; condensate extracted at a gas well is "non-associated". It is mechanically extracted from the natural gas produced from gas wells by separators located at the well head, a central facility in the field, or at a gas processing plant before the remainder of the gas stream is processed. Condensate consists primarily of the heavier hydrocarbon compounds and is used as a refinery and petrochemical feedstock. It is generally considered the equivalent of a light crude oil.

3. 15 U.S.C. § 757(i) states in pertinent part:
 (i). Exemption of stripper well production. (1) The first sale of stripper well crude oil shall be exempt from the regulation promulgated under section 4 of this Act [15 U.S.C. § 753] . . . .

basis for Mobil's contention that because the petroleum industry never considered condensate to be crude oil, the FEA was in error in regulating condensate as such, notwithstanding the admitted chemical similarity of condensate and the lighter fraction of hydrocarbons found in crude oil. We rejected the distinctions urged by Mobil between products explicitly covered by the Act and condensate—which rested upon the source and manner of production, rather than the chemical composition or utilization of their hydrocarbon components. We found that because condensate is commingled with light crude oil and utilized like light crude oil as a petrochemical and refinery raw material "many of the same reasons for upholding FEA's assertion of jurisdiction over gas processing plant products— as a necessary and proper means of achieving its statutory objectives—apply with equal force to uphold FEA jurisdiction over condensate". 566 F.2d at 102.[4]

The district court in the case before us concluded:

> Therefore, the court again holds on the basis of its reasoning in *Mobil Oil* that condensate, as a natural gas liquid, is within the FEA jurisdiction over "refined petroleum products" under the Allocation Act. The court also holds that the FEA has overlapping jurisdiction over condensate by virtue of its regulation of "crude oil," also in Section 4(a) of the Allocation Act.[5] Its authority over condensate is plenary; there is no economic or regulatory reason to distinguish associated or non-associated production of condensate in regard to the uses of condensate or the competing demands for condensate made by various sectors of the American economy.[6]

We find nothing in this case to compel a conclusion different from that reached in Mobil. Accordingly we affirm the decision of the district court that condensate produced from gas wells is subject to the FEA's regulatory jurisdiction.

■ Appellant's alternative contention is, in essence, that if the FEA is correct in classifying condensate as crude oil and thereby imposing upon condensate production and marketing the crude oil regulatory framework, then it is inconsistent, arbitrary, and capricious to deny condensate producers the benefits of the stripper well exemption. Appellants argue that crude oil cannot properly be deemed to mean one thing for some purposes under the EPAA and another thing for other purposes. We agree with the district court, however, that Congress intended the stripper well exemption for distinct economic purposes and did not contemplate the inclusion of liquid hydrocarbons of gas wells.

As enacted on November 23, 1973, the EPAA exempted from price controls the first sale of crude oil from leases whose daily average production did not exceed 10 barrels per well.[7] On December 24, 1974, the FEA issued Ruling 1974–28, 39 Fed. Reg. 44414 (1974), confirming its determination that gas well condensate was ineligible for the stripper well exemption. This regulation is specifically challenged by appellants.

4. We found additional support for the FEA's assertion of jurisdiction over condensate in the legislative reports accompanying the EPAA, and in subsequent legislation which effectively ratified the FEA's regulatory framework.

5. Section 4(a) of the EPAA required the President to promulgate regulations within 15 days after enactment for the mandatory allocation of "crude oil, residual fuel oil and each refined petroleum product" in amounts and at prices specified in the regulations.

6. We find no inconsistency in the district court's conclusion that the FEA had overlapping jurisdiction over condensate as either a "refined petroleum product" or as "crude oil".

The chemical composition of condensate resembles both light crude oil and natural gasoline, which is considered to be a refined petroleum product under the EPAA. See *National Helium, supra*. We have determined in both *Mobil* and *National Helium* that the FEA has the implied power to regulate chemically similar hydrocarbons, regardless of their geological source. We defer to the agency's decision that the marketing and utilization of condensate can best be regulated by placing it in the regulatory framework for crude oil.

7. EPAA, Pub.L. No. 93–159 (1973), § 4(e)(2)(A).

## 1150

■ Section 401 of the Energy Policy and Conservation Act of 1975, enacted on December 22, 1975, repealed the stripper well exemption of the EPAA.[8] It is clear from the Conference Report, however, that Congress contemplated that stripper well production would be placed in the upper tier of the two-tier pricing program then in effect.[9] The FEA amended its regulation to place stripper well crude oil under the upper tier, 10 C.F.R. § 212.71 et seq. Appellants also attack the exclusion of gas well condensate from the upper price tier.

Section 121 of the Energy Conservation and Production Act of 1976, enacted on August 14, 1976, reinstated the stripper well exemption by amending the EPAA. 15 U.S.C. § 757(i) (Supp.1977). The FEA then implemented the exemption of "stripper well crude oil", but continued to deny its application to condensate produced from gas wells. 10 C.F.R. 212.54, 41 Fed.Reg. 48319, 48323 (1976).

Since the enactment of the EPAA in November, 1973, the FEA has consistently defined crude oil to include gas well condensate for jurisdictional purposes under section 4(a) of the Act, but has excluded gas well condensate from the stripper well exemption. Yet, when Congress reinstated the stripper well exemption in August, 1976, by adding section 8(i) to the EPAA, there was no attempt to change the FEA's interpretation. Rather Congress added as subsection 8(i)(4) the provision that, "The President may define terms used in this subsection consistent with the purposes thereof."

■ The district court recognized that the purposes and goals of the EPAA require a "broad reading [of] the grant of statutory authority conferred on the FEA by the jurisdictional terms 'refined petroleum product' and 'crude oil' in section 4(a) of the Allocation Act". On the other hand, the "purpose of the stripper well exemption . . . requires a more limited interpretation of the term 'crude oil'. This exemption encourages production from a specific source of petroleum (rather than dealing generally with the allocation of petroleum and petroleum products)." Congress intended the exemption as an economic incentive to encourage production from otherwise marginally profitable low yield oil wells.[10] The court concluded that because the economics of oil wells and gas wells are significantly different, the denial of that economic incentive to gas well products was reasonable. "While a distinction between gas well condensate and oil well condensate makes little sense in regard to allocation, such differentiation is compelled in regard to economic incentives for production". We agree.

The legislative history of the stripper well exemption provides evidence of the intent of Congress in enacting the exemption. The exemption first appeared in the Trans-Alaska Pipeline Authorization Act,[11] which was adopted by Congress nearly simultaneously with the EPAA. The Conference Report made it clear that when the Pipeline Act referred to stripper wells it was Congress' understanding that it meant oil wells: "Stripper wells account for 71 percent of all of the *oil wells* in this coun-

---

**8.** Pub.L. No. 94–163 (1975).

**9.** S.Conf.Rep. No. 94–516, 94th Cong., 1st Sess. (1975); [1975] U.S.Code Cong. & Admin.News, pp. 1956, 2038.

**10.** In its Ruling 1974–28, the FEA noted that both Congress and the FEA used the term "stripper well" in the manner in which it was understood in the petroleum industry, i. e., a crude oil well producing such small amounts that the producer received only marginal return over the cost of production, and that neither Congress nor the FEA intended to extend the stripper well language to encompass production of "crude petroleum and petroleum con-

densates, including natural gas liquids" of wells which do not produce crude petroleum. The FEA noted further that the inclusion of gas well condensate under the stripper well exemption could yield the anomalous result of providing an incentive to keep the volume of natural gas liquids extracted from the gas below ten barrels per day per gas well, contrary to the congressional intent to promote production of petroleum products. See 39 Fed.Reg. 44414 (1974).

**11.** Pub.L. No. 93–153 (1973) (43 U.S.C. § 1651 et seq., 12 U.S.C. § 1904 (note)).

try, but produce an average of only 3.6 barrels per day, or only 13 percent of total U. S. domestic crude production." H.R. Conf.Rep. No. 93–624, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin. News, pp. 2523, 2532. (Emphasis added).

The Conference Report explained the economic reasons for the exemption as follows:

Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production they are shut in, and a known and developed crude oil reserve is lost to U.S. production. Removing Phase IV price restraints from these marginal stripper wells has the effect of increasing the value of crude oil they produce . . . This price incentive will encourage owners and operators of stripper wells to maintain production and to keep those wells in operation for longer periods of time . . . . *Id.*

The report went on to emphasize that agency administration of the exemption should insure that the "limited" exemption was strictly enforced "for the express purposes described above" and "not in any way broadened". *Id.* "The *sole* purpose and objective" was "to keep stripper wells—those producing less than ten barrels per day—in production . . . ." *Id.*

We may presume that Congress in enacting a stripper well exemption in the EPAA on the next day intended similar application and objectives. Although the legislative reports for the EPAA lack the extended discussion of the exemption in the report accompanying the Pipeline Act, it is nonetheless apparent that there was no difference in the goals intended for the EPAA exemption. The House Report stated that the exemption was enacted in the EPAA "in the belief that pricing controls and forced

allocation of stripper oil would unnecessarily inhibit production . . . ." H.R.Rep. No. 93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News, pp. 2582, 2598.[12]

The operations and economics of gas wells and oil wells are distinct. The profitability of an oil well depends upon the production of liquid hydrocarbons. In contrast, the profitability of a gas well depends primarily upon the volume of dry gas produced, not the amount of liquids (condensate) associated with that gas. The district court noted that during oral argument appellants' representative admitted that no generalization was possible with respect to the role of condensate in the overall profitability of a gas well. The court concluded that it was unlikely "that Congress would base a production incentive on a fluctuating factor, condensate, that may not have any bearing on the overall profitability of a gas well"; nor would it tie an economic incentive for gas wells to the exact threshold of ten barrels per day assigned to oil wells.

It may be noted also that the FEA received numerous unfavorable comments with respect to Ruling 1974–28. (see note 9). As a result it reopened its consideration of the possible inclusion of gas well condensate under the stripper well exemption as a part of a broader rule-making process. After considering comments, it saw no reason to modify its ruling, concluding that the ten barrel per day limit "has no meaningful correlation to the upper production limits of a marginal gas well". 40 Fed.Reg. 40819 (1975).

The FEA has recognized, however, that some form of exemption for condensates may be appropriate to stimulate production from marginal gas wells. See, e. g., 41 Fed.Reg. 18876 (1976); 41 Fed.Reg. 36181

12. Appellants rely upon the statement of the author of the exemption—who said that in his state 94 percent of the "oil *and* gas wells" were stripper wells, 119 Cong.Rec. 34325 (1973) (emphasis added)—to show that the term was intended to include both types of wells. We agree with the district court, however, that this passing reference "would not bear the weight which Aztec and Southern Union place upon it". In context, the statements indicate he was discussing the economics of oil wells. Immediately after this reference he states that a number of wells were plugged because the price for *crude* did not pay the cost of pumping it. He did not refer to the price of dry gas at any time. It may well be that since gas usually accompanies oil in oil wells he was merely referring to single integrated oil *and* gas wells.

(1976). While the FEA has determined that the ten barrel a day limit is inappropriate, it is seeking other methods of defining a marginal gas well, such as tying the exemption to gross revenues. 41 Fed.Reg. 36181 (1976). These agency actions provide further evidence that the FEA has not acted arbitrarily or capriciously in denying the exemption to gas well condensate, but rather is making a reasonable, concerted effort to accomplish the purposes intended by Congress.

 The FEA's interpretation of its statutory mandate is entitled to judicial deference. *E. g., Marathon Oil Co. v. FEA*, 547 F.2d 1140, 1145 (Em.App.1976), *cert.* *denied* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977). Because the exclusion of gas well condensate from the stripper well exemption is founded upon a rational economic basis and is supported by both logic and legislative history, we conclude that the district court's decision upholding the FEA regulations should be affirmed.

Affirmed.