ENERGY CONSUMERS AND PRODUCERS ASSOCIATION, INC., formerly Oklahoma Association of Energy Consumers and Producers, Inc., Plaintiff–Appellee,

v.

DEPARTMENT OF ENERGY, Defendant–Appellant.

No. 10–21.

Temporary Emergency Court of Appeals.

Argued Nov. 16, 1979.

Decided April 4, 1980.

Certiorari Denied Oct. 6, 1980. See 101 S.Ct. 102.

Dina R. Lassow, Dept. of Justice, Washington, D. C., with whom Alice Daniel, Acting Asst. Atty. Gen. of the Civ. Div., Dept. of Justice, C. Max Vassanelli of the Dept. of Justice, Washington, D. C., John P. McKenna, Arthur E. Gowran and Frank W. Krogh, Dept. of Energy, Washington, D. C., were on the brief for defendant–appellant Department of Energy.

Fred A. Gipson, Seminole, Okl., with whom Richard L. Bohanon and Lynn A. Pringle of Bohanon & Barth, Oklahoma City, Okl., and Richard S. Roberts, Wewoka, Okl., were on the brief for plaintiff–appellee, Energy Consumers and Producers

Ass'n, Inc., formerly Oklahoma Ass'n of Energy Consumers and Producers, Inc.

Before CHRISTENSEN, JOHNSON and BECKER, Judges.

WILLIAM H. BECKER, Judge.

On this appeal the appellant Department of Energy (DOE) assigns error in the ruling of the district court adjudging invalid Part III of Ruling 1975–12, which was issued on August 29, 1975 by the General Counsel of the Federal Energy Administration (FEA), predecessor of DOE, as an interpretative ruling, without prior public notice and opportunity to comment required by paragraphs (b) and (c) of § 553, Title 5 U.S.C., a part of the Administrative Procedure Act (APA), codified as Subchapter II, § 551 to § 559 inclusive, Title 5 U.S.C. Ruling 1975–12 was first published on September 4, 1975. (40 F.R. 40828.)

Part III of Ruling 1975–12 purported to interpret the exemption from price control of crude oil produced from "stripper wells," provided in successive statutes and regulations of DOE and its predecessors FEA, Federal Energy Office (FEO) and Cost of Living Council (CLC). The statutory and regulatory history of the "stripper well" exemption, material to this appeal, is fully and accurately set forth in the original majority and dissenting opinions in *Energy Reserves Group, Inc. v. Department of Energy* (Em.App.1978) 589 F.2d 1082, explained in *Duncan v. Theis* (Em.App.1979) 613 F.2d 305.

The successive statutes and regulations described in the opinions in *Energy Reserves Group, Inc. v. Department of Energy, supra,* imposed an emergency mandatory system of allocation and control of prices of petroleum products from which crude oil produced from "stripper wells" was exempt. In § 4(e)(2)(A) of the Emergency Petroleum Allocation Act (EPAA), P.L. 93–159, 87 Stat. 627, effective in 1973, the statutory "stripper well" exemption was as follows:

The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

Regulations defining the stripper well exemption were promulgated successively by CLC and FEA. § 150.54(s), 6 C.F.R. (page 146) (1974) and § 210.32, 10 C.F.R. (page 98) (1976). The formula for determining "average daily production" as used in the statutes was consistently defined in the regulations of CLC and FEA as follows:

(b) Definitions: "Average daily production" means the qualified maximum total production of crude oil, including condensates, produced from a property, divided by a number equal to the number of days in the year times the number of *wells that produced crude oil, including condensates,* from that property in that year. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production. (Emphasis added.) [*Energy Reserves Group, Inc. v. Department of Energy, supra,* (Em.App.1978) 589 F.2d at 1091.]

In 1975 FEA found it desirable to issue Ruling 1975–12, Part III, purporting to interpret the application of the regulations and underlying statute defining the stripper well exemption to multiple completion wells. Part III of Ruling 1975–12 is as follows:

III. *Multiple Completion Wells.—* Where a property encompasses the right to produce crude oil from two or more producing formations or reservoirs, producers sometimes utilize a production technique involving "multiple completion wells." This technique, which makes use of an existing well that produces from one formation, involves drilling from the existing casing separate well–bores or elongating existing well–bores in order to reach other formations. By the installation of additional tubing strings, crude oil

may in this manner be produced concurrently from two or more formations. A multiple completion well is to be distinguished from a "recompleted well", which involves the technique of drilling a separate well–bore from an existing casing in order to reach the same reservoir, or redrilling the same well–bore to reach a new reservoir after production from the original reservoir has been abandoned. While a multiple completion well involves the simultaneous production from two or more reservoirs, a recompleted well involves production from only one formation.

Thus, a multiple completion well is designed to accomplish the same task as two or more separate and distinct producing wells, although conserving initial capital outlay, it functions in many ways as two or more separate producing wells: Crude oil from each formation remains isolated in distinct tubing strings until reaching the surface, where it may either be commingled with crude oil from other formations, or may continue to be diverted separately through alternative chokes and valves in the wellhead "Christmas tree" fitting. In this way, differences in API gravity, sulphur content and mineral impurities that might be characteristic of different formations, can be maintained.

Although a multiple completion well is a somewhat less costly alternative to drilling an entirely separate well in order to reach another producing formation in the field, it nevertheless represents a significant capital investment and poses certain additional problems beyond those encountered with single or separate wells. For example, the artificial lift in a multiple completion well is more complicated and, correspondingly more costly to install. Furthermore, repairs to any of the intervals are more costly than in separate wells and can result in a temporary shut–down of production from all reservoirs.

Therefore, the FEA has determined that multiple completion wells may be considered as two (or more) wells for the purpose of calculating "average daily production" pursuant to the stripper well lease exemption of 10 CFR 210.32 if,

(a) The well consists of two (or more) separate tubing strings run inside the casing, each of which carries crude oil from a separate and distinct producing formation, *and*

(b) the production capabilities of each formation are unaffected by any change in the production level of any other formation producing through the same well.

This result is consistent with the congressional policy of increasing the incentive and economic feasibility of maintaining production of crude oil from stripper well leases through advanced production techniques.

### Application of Part III of Ruling 1975–12 To "Commingled Wells"

The district court properly described the administrative application of Part III of Ruling 1975–12 to the problem created by claims of the plaintiff–appellee (appellee) on behalf of its members in the following parts of its Memorandum Opinion (Transcript [Tr.] 876 at pages 878–879):

OAECP alleges that Ruling 1975–12 as applied to commingled wells is arbitrary and capricious. Further, OAECP alleges that the rule was improperly adopted by the FEA and is void. FEA contends that Ruling 1975–12 is an interpretive rule and, as such, is not subject to the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553.

A multiple completion well produces crude oil from several oil bearing formations by utilizing a common well casing while segregating the oil produced from each formation into a separate tubing string. A commingled well is similar to a multiple completion well in that it also produces crude oil from two or more oil bearing formations through a common well casing. However, a commingled well does not segregate the oil from each formation but produces the oil from the several formations through a single tubing string. Thus the crude oil from any single oil producing formation is mixed with the crude oil from all other oil–pro-

ducing formations which have been tapped through the common well casing.

Several of the members of OAECP are engaged in the production of crude oil through the utilization of commingled wells in which one or more of the oil producing formations produced less than ten barrels per day at the time the well was completed as a commingled well. However, now that the well is being operated as a commingled well, the amount of crude oil produced through the well from all of the oil producing formations which have been tapped through the common well casing totals in excess of ten barrels per day. These members have previously sold the oil produced, or portions of it, at the unregulated market price in the belief that if one of the oil producing formations in the commingled well was producing a certain amount of oil at the time the formations were commingled, and the amount of oil produced from that formation would qualify a single completion well as a stripper well, the amount of oil produced from that formation in a commingled well would also qualify for stripper well status. FEA disagreed. FEA adopted the position that it is not possible to accurately determine in a commingled well how much oil is being produced from a formation at any given time while such determination is readily made in a multiple completion well. In adopting this position, FEA determined that commingled wells would not qualify for consideration as two (or more) wells for the purpose of calculating average daily production under the stripper well lease exemption. As a result, FEA cited members of OAECP for selling crude oil at a price in excess of the ceiling price and issued remedial orders requiring those members to make reimbursement for alleged overcharges.

Contrary to its contentions in this appeal, appellee confirms the uniform consistent application by FEA of Part III of Ruling 1975–12 in the following language in its brief:

The primary issue in controversy between Plaintiff and the FEA is this: Should a commingled well which produces simultaneously from more than one reservoir be counted as more than one well for the purpose of the stripper well lease exemption. In every decision on this issue the agency has said "no," basing its orders and denials of appeals from those orders exclusively on Ruling 1975–12. (Appellee's Brief, 1.)

(This last phrase ignores the underlying statute and regulation, but the quotation concedes the uniformly consistent administrative construction of the stripper well exemption.)

### Trial Court Proceedings

Appellee Energy Consumers and Producers Association, Inc. [formerly Oklahoma Association of Energy Consumers and Producers, Inc. (OAECP)] a non–profit corporation, filed the complaint in this action in the United States District Court for the Eastern District of Oklahoma, on behalf of its members producing oil from "commingled wells" that were denied the benefit of the stripper well exemption by application of Part III of Ruling 1975–12. The complaint sought declaratory and injunctive relief against FEA in three claims for relief (each denominated as a "cause of action"). (Tr. 8–15.) The relief granted on the first and third claims for relief are the subject of this appeal by appellant DOE (successor to FEA).

In the first claim for relief appellee sought a retroactive and prospective declaratory judgment that Part III of Ruling 1975–12 was invalid and void because (a) it exceeded the statutory authority of FEA; (b) its adoption and application were unlawful, arbitrary and capricious, and an abuse of discretion; (c) it was contrary to "constitutional right, power or privilege"; (d) its issuance was "without observance of procedure required by law"; (e) it was "wholly unwarranted by the facts and the prudent and economic production of crude oil" and "will cause waste and does not facilitate the measurement of oil produced from separate formations"; (f) its retroactive application "is contrary to statutory or constitutional authority"; and (g) its prospective applica-

tion violates due process rights of Amendment V of the Constitution of the United States. (Tr. 5.)

The third claim for relief sought injunctive relief against enforcement of Ruling 1975–12 on the same factual and legal contentions of the first claim for relief.

Other factual and legal contentions of the complaint concern a separate controversy and are not material to this appeal.

FEA filed an answer (Tr. 16–21), and moved to dismiss the action on the grounds the appellee lacks standing to sue because (1) it is not representative of its members; (2) it has not established that its members are suffering from immediate harm; and (3) its members are indispensable parties. (Tr. 34.) This motion was denied by the Honorable Joseph W. Morris, the district judge to whom this action was assigned for pretrial proceedings and trial. (Order Denying Motion to Dismiss, Tr. 34–37.)

FEA filed a motion for summary judgment, supported by affidavits and exhibits, on the issue of validity of Ruling 1975–12 on the ground that it was an interpretative ruling exempt from the notice and comment procedures of the APA under § 553(b) and (c), Title 5 U.S.C., and otherwise lawful and valid. (Tr. 38–131.) The district court denied the motion of FEA for summary judgment. (Tr. 265–266.)

The action was tried without a jury, on the merits by the district judge to whom the action was originally assigned. (Tr. 284–789.) That district judge, Judge Morris, resigned and the parties agreed to submit the action for decision by the Honorable H. Dale Cook, United States District Judge, on the transcript of the trial before Judge Morris. (Tr. 799.)

### Decision by the District Court

On June 29, 1979, the district court filed a memorandum opinion holding that Part III of Ruling 1975–12 was "void for lack of proper agency procedures and consideration for its adoption." (Tr. 876.) Because of the novelty of one of the two bases for this conclusion and to make clear the other ba-

sis, the following material parts of the opinion of the district court are set forth verbatim (Tr. 879–883):

"In 1946, Congress passed the Administrative Procedure Act, Pub.L. 79–404, 60 Stat. 237. As originally enacted, the rulemaking portion of the Administrative Procedure Act (APA) stated in part:

### "RULE MAKING

"Sec. 4. Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts–

"(a) NOTICE.–General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding in a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"The APA survived essentially unchanged until September 6, 1966 when Congress codified the general and permanent laws relating to the organization of the government as Title 5 United States Code. At that time, the APA became Chapter 5 of Title 5, and Section 4, quoted above, became codified as 5 U.S.C. § 553 as follows:

"§ 553. Rule making.

"(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

"(1) a military or foreign affairs function of the United States; or

"(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits or contracts.

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

"(1) a statement of the time, place and nature of public rule making proceedings;

"(2) reference to the legal authority under which the rule is proposed; and

"(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

"Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

"(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"By comparing Section 4 of the APA with 5 U.S.C. § 553, it is readily apparent that any changes of substantive law that have occurred during the process of codification, at least so far as the above quoted provisions are concerned, are minimal. Therefore, for a proper understanding of the intent of Congress in enacting section 4 of the APA and its successor, 5 U.S.C. § 553, it is appropriate to look to legislative reports that originally accompanied the APA. Such a report is the legislative history of the APA contained in House Report No. 1980 by the House Committee on the Judiciary dated May 3, 1946 *reprinted in* (1946) U.S. Code Cong.Serv. 1195. This report begins with a discussion of the recognized importance of the legislation by stating:

"For more than 10 years this legislation has been under consideration. Certainly no measure of like character has had the painstaking and detailed study and drafting. Both the legislative and executive branches have participated, and private interests of every kind have had an opportunity to present their views. In the legislative branch there have been four major proposals for the creation of an administrative court, and at least eight for the regulation of administrative procedure. Two important studies were conducted in the executive branch under the late president Franklin D. Roosevelt—each resulting in reports to Congress with legislative recommendations. Private individuals and organizations have made innumerable studies and recommendations. While various proposals have been made over the years, the continuous line of development leading to the present bill is clear and illuminating.

"1946 U.S. Code Cong.Serv. at 1195. In reviewing the 1937 report of the Presidential Committee on Administrative Management, the Judiciary Committee noted:

"The problem has been how to deal with (administrative functions) in our complex governmental setup, without unduly interfering with necessary governmental operations.

"1946 U.S. Code Cong.Serv. at 1196. By noting the 1938 Senate hearings on the creation of an administrative court, the committee stated:

"There is need for a simple and standard plan of administrative procedure, together with the statement of legal and enforceable guides for administrative officers and agents in their daily operations. In short, an important object of any legislation in this field is not only to provide judicial redress but to assure administrative fairness in the beginning so that litigation may become unnecessary.

"1946 U.S. Code Cong.Serv. at 1196. In discussing the substance of the APA, the Judiciary Committee stated:

"Manifestly the bill does not unduly encroach upon the needs of any legitimate government operation, although it is of course operative according to its terms even if it should cause some administrative inconvenience or changes in procedure.

\* \* \* \* \* \*

"The bill is an outline of minimum essential rights and procedures. Agencies may fill in details, so long as they publish them. It affords private parties a means of knowing what their rights are and how they may protect them, while administrators are given a simple framework upon which to base such operations as are subject to the provisions of the bill.

\* \* \* \* \* \*

"In the 'rule making' (that is, 'legislative') function it provides that with certain exceptions agencies must publish notice and at least permit interested parties to submit their views in writing for agency consideration before the issuance of general regulations (sec. 4).

\* \* \* \* \* \*

"The public–information provisions of section 3 are of the broadest application because, while some functions and some operations may not lend themselves to formal procedure, all administrative operations should as a matter of policy be disclosed to the public except as secrecy may obviously be required or only internal agency 'housekeeping' arrangements may be involved. Sections 4 and 5 prescribe the basic requirements for the making of rules and the adjudication of particular cases.

"1946 U.S. Code Cong.Serv. at 1024–5 [sic].

"Thus, it is clear that the Congressional intent in formulating the APA was more than a desire to standardize the procedures utilized by the various agencies but included an attempt to provide for procedures that would recognize the fundamental fairness of governmental operations being conducted in full view of the governed.

"In issuing its Ruling 1975–12, the FEA has stipulated that the procedures in 5 U.S.C. § 553 were not followed, at least as to section 3 of the ruling. The government contends that the ruling qualifies as an interpretative rule under 5 U.S.C. § 553(b)(A) and, as such, does not require notice or hearing. However, for this agency determination to survive, the rule promulgated cannot be more than an 'internal agency "housekeeping" arrangement.' Such is simply not the case here.

"The creation of the FEA by Congress through the Federal Energy Administration Act was accompanied by administrative provisions the FEA was to apply. These provisions were contained in section 7 of the act and state, in part:

"(i)(1)(A) Subject to paragraphs (B), (C), and (D) of this subsection, the provisions of subchapter II of chapter 5 of title 5, United States Code, shall apply to any rule or regulation, or any order having the applicability and effect of a rule as defined in section 551(4) of title 5, United States Code, issued pursuant to this Act, including any such rule, regulation or order of a State or local government agency, or officer thereof, issued pursuant to authority delegated by the Administrator.

"(B) Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulation, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation or order. In addition, public notice of all rules, regulations, or orders described in paragraph (A) which are promulgated by officers of a State or local government agency shall to the maximum extent practicable be achieved by publication of such rules, regulations, or orders in a sufficient number of newspapers of statewide circulation calculated to receive the widest possible notice.

"(C) In addition to the requirements of paragraph (B), if any rule, regulation, or order described in paragraph (A) is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded. To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of any such rule, regulation or order. A transcript shall be kept of any oral presentation.

"(D) Any officer or agency authorized to issue the rules, regulations, or orders described in paragraph (A) shall provide for the making of such adjustments, consistent with the other purposes of this Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, rescission of, exception to, or exemption from, such rules, regulations and orders. If such person is aggrieved or adversely affected by the denial of a request for such action under the preceding sentence, he may request a review of such denial by the officer or agency and may obtain judicial review in accordance with paragraph (2) of this subsection when such denial becomes final. The officer or agency shall, by rule, establish appropriate procedures, including a hearing where deemed advisable by the officer or agency, for considering such requests for action under this paragraph.

"Thus, under these procedures, it would appear that the congressional intent in setting a procedural requirement in addition to those of the APA was to have the FEA conduct its operations subject to even more public scrutiny than the average administrative agency. Additionally, under section 7(i)(1)(C), quoted above, it would appear that even if a ruling of the FEA were deemed to be interpretative under 5 U.S.C. § 553(b)(A), it would still be required to afford an opportunity for public comment if it were likely to have a 'substantial impact' on either the national economy or large numbers of individuals or businesses.

"The evidence at trial shows that at the time the wells were commingled, one or more of the producing formations involved produced less than ten barrels of crude oil per day. Acting on the clear legislative statement that wells producing less than ten barrels per day were to be exempt from the pricing restrictions, the producers treated the recovered crude oil as coming from separate wells and attempted to apportion the crude oil among the producing formations and set its price accordingly. The FEA then adopted its regulation, without notice or opportunity for comment, which determined that the producers were selling crude oil at illegal prices. The FEA now adopts the position that the regulation is valid since it is practically impossible to determine which oil producing formation is actually contributing a specific quantity of crude oil to the commingled total. The FEA in section 3 of Ruling 1975–12 makes reference to justifying treating multiple completion wells as separate wells at each producing formation because of the capital investment separate single completion wells would require; however, the statute exempting wells producing less than ten barrels of crude oil per day is silent as to justifying the exemption on grounds of capital investment required. Finally, as a result of its Ruling 1975–12, the FEA is now requiring the producers to reimburse substantial sums of money, in at least one instance an amount in excess of $500,000.00.

"Additionally, the FEA application of Ruling 1975–12 would seem to mandate inconsistent results. Assume the case where there exists a well casing penetrating through three distinct oil producing formations, each of which have been shown to have an average daily production of crude oil of four barrels. If the well is completed as a multiple completion well, Ruling 1975–12 will permit all twelve barrels recovered per day to be sold at the unregulated price. However, if the well is completed as a commingled well, Ruling 1975–12, as applied here, prohibits the sale of any of the crude

oil recovered at the unregulated price. Inconsistencies of this sort are the kinds of situations that the notice requirements of the Administrative Procedure Act sought to avoid by mandating full and informed agency action.

"Accordingly, the court concludes that section three of Federal Energy Administration Ruling 1975–12 is void for lack of proper agency procedures and consideration for its adoption.

### Bases of Decision of the District Court

From the foregoing quotation it is apparent that the district court held that Ruling 1975–12, admittedly adopted without the notice and comment procedures of the APA, § 553(b) and (c), Title 5 U.S.C., was invalid because:

(1) Part III of Ruling 1975–12 was not an interpretative ruling because an interpretative rule "cannot be more than an internal agency 'housekeeping' arrangement"; and

(2) § 7(i) of the Federal Energy Administration Act (FEAA) [P.L. 93–275, 88 Stat. 96, formerly § 766(i), Title 15 U.S.C., repealed by P.L. 95–91, 91 Stat. 565] required notice and comment procedures prior to its issuance even if Part III of Ruling 1975–12 is an interpretative rule, because it was likely to have a "substantial impact" on either the national economy or a large number of individuals or businesses.

### Contentions of Appellee In Support of Decision of the District Court

In its brief, appellee expands the bases of the decision expressed by the district court, by contending that the judgment should be affirmed on the merits for the following reasons:

I. Ruling 1975–12 (Part III) is a substantive (legislative) ruling, requiring the notice and comment provisions of the APA and FEAA because:

A. Ruling 1975–12 (Part III) was neither required nor compelled by existing regulations;

B. There was no contemporaneous construction of Ruling 1975–12 (Part III);

C. Ruling 1975–12 (Part III) either expanded existing regulations or constricted existing regulations;

D. Ruling 1975–12 (Part III) is the sole legal authority for all multiple zone production as it relates to the stripper well lease amendment;

E. Ruling 1975–12 (Part III) had substantial impact and is therefore invalid for failure to comply with notice and comment procedures; and

F. Failure of FEA to comply with notice and comment procedures resulted in a ruling which is not based on substantial evidence, and which is arbitrary and capricious.

### Challenge to Jurisdiction of This Appeal by Appellee

In point II of its brief, appellee contends that this Court "has no jurisdiction over this appeal" because this appeal does not arise under the Economic Stabilization Act of 1970 (ESA), § 1904 note, Title 12 U.S.C., or the Emergency Petroleum Allocation Act (EPAA), §§ 751 et seq., Title 15 U.S.C.

This contention was made earlier in a motion of appellee to dismiss the appeal, submitted on briefs before oral argument. The motion to dismiss was denied. Nevertheless, the contention is resubmitted by appellee.

### Contentions of Appellant DOE

As successor to FEA, DOE contends that the judgment of the district court was erroneous and should be reversed because:

A. Ruling 1975–12 (Part III) is an interpretative ruling and is therefore exempt from the rulemaking requirements of the APA; and

B. The court below applied an erroneous definition of an interpretative rule.

### Questions Presented

The initial question presented is whether this Court should reconsider and vacate its

order denying the motion of appellee to dismiss this appeal for lack of jurisdiction.

The question on the merits presented on this appeal is whether Ruling 1975–12 (Part III) is an "interpretative ruling" and therefore exempt from the rule making notice and comment requirements of the APA, § 553(b) and (c), Title 5 U.S.C. and of § 7(i) of the FEAA [now repealed, formerly § 766(i), Title 15 U.S.C.].

### Decision on Appeal

For reasons stated hereinafter, we reaffirm our jurisdiction of this appeal and reverse the judgment of the district court.

### I.

### Jurisdiction of TECA

After reconsideration, the earlier order denying the motion of appellee to dismiss this appeal is affirmed. In support of its motion appellee contends that the issues on this appeal arise under the APA rather than the EPAA. The issues on this appeal arise under the EPAA. The appeal is based upon alleged error of the FEA in failing to comply with the prior notice and comment requirements of the original § 4 of the APA, codified as § 553(b) and (c), Title 5 U.S.C., "as amplified by the Federal Energy Administration Act," §§ 761 *et seq.*, Title 15 U.S.C. Judge Johnson of this Court has recently stated the rule as follows:

> But as this court plainly stated in *Standard Oil* . . . "Section 4 of the APA was incorporated by reference in Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1)." An issue arising under the APA is not a collateral issue, then, but, by virtue of Section 5(a)(1) of the EPAA, an issue arising under the EPAA itself. [*Texaco Inc. v. Department of Energy* (Em.App.1979) 616 F.2d 1193, note 4, at 1197.]

In accord is the earlier ruling in *Standard Oil Co. v. Department of Energy* (Em.App. 1978) 596 F.2d 1029, l.c. 1056, the source of the quotation in the excerpt from the *Texaco, Inc.* case, *supra*. That this Court has

exclusive jurisdiction of appeals from final decisions by district courts on issues arising under the EPAA is not controverted.

### II.

### Part III of Ruling 1975–12 Was Interpretative And Exempt From the Notice and Comment Requirements of the APA and FEAA

The first reason given by the district court for holding that Part III of Ruling 1975–12 was "void," was the novel conclusion that, under the APA, an interpretative rule cannot be more than "an internal agency 'housekeeping' arrangement." No judicial or statutory authority in support of this proposition is cited by the district court or the appellee. The portion of the legislative history of the APA relied on by the district court, and quoted above, does not support the conclusion of the district court, which is contrary to the plain wording of the exemption of § 553(b)(3)(A) of the APA and the overwhelming case law including cases cited in briefs of both parties on the definitions and identification of interpretative and legislative administrative rules.

The second reason given by the district court for its holding that Part III of Ruling 1975–12 was "void" was that, even if it is an interpretative ruling, notice and comment procedures are required by § 7(i) of the FEAA [now repealed, formerly § 766(i), Title 15 U.S.C.] because the ruling would have a "substantial impact" on either the national economy or large numbers of individuals or businesses. This conclusion is directly contrary to the express provisions of § 7(i) of the FEAA which subparagraph expressly makes it applicable to rules as defined in the APA at § 551(4), Title 5 U.S.C., and no other rules.

Interpretative rules, interpreting an existing statute or existing legislative regulation, or both, are not within the definition of § 551(4) of the APA because interpretative rules do not have future effect as that term is used in § 551(4), and are not binding on the courts. *Energy Reserves Group, Inc. v. Department of Energy, supra* (Em.App. 1978) 589 F.2d at 1100.

140

■ Interpretative rules do not have primarily a future effect, as do legislative rules, to be applied prospectively only. The effect of Part III of Ruling 1975–12 is retroactive, as the appellee complains, as well as current and prospective. *American Express Co. v. United States* (C.C.P.A.1973) 472 F.2d 1050; 3 B. Mezines, J. Stein & J. Gruff, *Administrative Law Treatise* § 18.-02[5] (1979 & Supp.1979).

In the *American Express Co.* case, *supra*, after quoting the provisions of § 551(4) of the APA, the court made it clear that § 551(4) defined legislative rules primarily concerned with the future rather than evaluation of past conduct, stating:

These definitions per se do not clearly establish whether the Secretary's activities in connection with a countervailing duty determination under section 303 would constitute rule making or an adjudication pursuant to an order if the APA is assumed to be applicable to section 303 investigations. However, resort to other sources, including Administrative Procedure Act, Legislative History, 79th Congress 1944–46 (hereinafter *History*) and Attorney General's Manual on the Administrative Procedure Act, 1947 (hereinafter *Manual*) helps resolve the question. Thus, it is indicated that rule making is legislative in nature (*History*, pp. 193, 251, 353; *Manual*, pg. 14), is primarily concerned with policy considerations for the future rather than the evaluation of past conduct (*History*, pg. 355; *Manual*, pg. 14), and looks not to the evidentiary facts but to the policymaking conclusions to be drawn from the facts (*Manual*, pg. 14). On the other hand, adjudication is judicial rather than legislative in nature (*History*, pp. 193, 251, 353, 355), has an accusatory flavor and may result in some form of disciplinary action (*History*, pp. 353, 408; *Manual*, pg. 14), and is concerned with issues of fact under stated law (*History*, pg. 353; *Manual*, pp. 14–15). [*American Express Co. v. United States, supra*, (C.C.P.A.1973) 472 F.2d at 1055.]

This definition excludes an interpretative rule which may have some effect and "–it would be frivolous if it did not–". *British Caledonian Airways, Ltd. v. C.A.B.* (C.A.D. C.1978) 584 F.2d 982, l.c. 990.

So if Part III of Ruling 1975–12 is an interpretative rule, neither reason given by the district court for holding it invalid is legally sound.

■ We conclude that Part III of Ruling 1975–12 is an interpretative rule, and that the judgment of the district court must be reversed.

■ In the field of federal administrative law and within the meaning of the APA, an interpretative rule is one that in form and substance interprets (1) a statute, (2) a legislative rule, (3) another interpretative rule, (4) judicial decisions, (5) administrative decisions, (6) administrative rulings, (7) any other law or interpretations, (8) any combination of the above, or (9) nothing. 1 K. Davis, *Administrative Law Treatise* § 5.03, at 304 (1st ed. 1958); 2 K. Davis, *Administrative Law Treatise* § 7.8, at 36–43 (2d ed. 1979); *Gibson Wine Co. v. Snyder* (C.A.D.C. 1952) 194 F.2d 329; *Energy Reserves Group, Inc. v. Department of Energy, supra*, (Em.App.1978) 589 F.2d at 1092. The definition in the district court decision failed to recognize this established meaning of the term "interpretative rule."

Because Part III of Ruling 1975–12 was an interpretation of the existing statutory stripper well exemption and of the legislative regulation issued pursuant thereto, it is an interpretative rule which is not binding on the courts, has no future effect and therefore is exempt from the notice and comment procedures of the APA, § 553(b) and (c), Title 5 U.S.C., and § 7(i) of the FEAA. *Energy Reserves Group, Inc. v. Department of Energy, supra*, (Em.App. 1978) 589 F.2d 1082, explained in *Duncan v. Theis, supra*, (Em.App.1979) 613 F.2d 305.

This leaves the question whether for reasons not relied on by the district court, but submitted by appellee, Part III of Ruling 1975–12 is legislative rather than interpretative. If it is not interpretative, it is not

exempt from the notice and comment requirements of the APA, § 553(b) and (c), Title 5 U.S.C., and possibly of § 7(i) of the FEAA. It is concluded that no other such reason, or reasons, exist that support or require the conclusion that Part III of Ruling 1975–12 is not an interpretative rule.

Appellee relies on several unrecognized tests to support its contention that Part III of Ruling 1975–12 is legislative rather than interpretative.

Contention A of appellee, quoted above, relies on a supposed test, that the rule was "neither required nor compelled."

The authorities cited in support of this supposed test do not support its existence. They include *Energy Reserves Group, Inc. v. Department of Energy, supra,* (Em.App. 1978) 589 F.2d 1082, which is directly in conflict with this contention of the appellee.

In contention B, *supra,* appellee asserts a supposed "contemporaneous construction" test. Whatever that test may be, if it exists, it has no application to the issues in this appeal.

The expansion or constriction test, relied on by appellee in contention C, if it exists in any form, is inapplicable, because Part III of Ruling 1975–12 did not in form or substance purport to expand or restrict the underlying statute and regulation defining the "stripper well" exemption. It interpreted them. The assertion that DOE argued earlier that it expanded the number of wells to be exempted by the stripper well definition, is based on an unsound assumption that the rule was legislative in nature and changed the scope of the underlying statute and regulation.

In contention D, the sole legal authority contention, appellee relies on inapposite authority which relates to a legislative rule. The contention ignores the fact that Part III of Ruling 1975–12 in form and substance is an interpretation of the legally controlling statute and regulation.

The contention lettered E of appellee, that Part III of Ruling 1975–12 was a legislative rule and requires prior notice and comment because it had "substantial impact" is unsound for the reasons stated in the opinion in the *Energy Reserves Group, Inc.* case, *supra,* (Em.App.1978) 589 F.2d 1082, and authorities therein cited, including *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Notwithstanding the view of Judge Christensen that in some contexts a "substantial impact test" may bear upon whether a rule is interpretative or legislative, see *Energy Reserves Group, Inc., supra,* (Em. App.1978) 589 F.2d at 1102–03 (Christensen, J., concurring), he agrees that no such test on the facts of this case would render Part III of Ruling 1975–12 anything other than interpretative within the contemplation of the APA.

The "informed reflection" test enunciated in contention F of appellee, quoted above, is another way of stating that the prior notice and comment requirements are applicable to legislative rules. The underlying stripper well statute and regulation used the word "wells" which was interpreted by Part III of Ruling 1975–12. So appellee is in error in contending that the "action at issue is not mentioned explicitly or implicitly in the ruling being challenged." (Appellee's Brief, 20.)

Contention F, that Part III of Ruling 1975–12 is not based on substantial evidence, because of failure to comply with the notice and comment procedures is based on the erroneous assumption that it is legislative rather than an interpretative rule. The contention that it is arbitrary and capricious is without merit, because, as pointed out hereinafter, Part III of Ruling 1975–12 has a rational basis and is a reasonable interpretation of the statutory stripper well exemption and stripper well regulation adopted pursuant to statutory authority.

Appellee contended that Part III of Ruling 1975–12 was invalid because it was retroactive in effect, or at least should not be applied retroactively. These contentions are lacking in merit because the stripper well statute and regulation are the basis of the challenged action by FEA, not the interpretative rule. *Energy Reserves Group,*

*Inc. v. Department of Energy, supra,* (Em. App.1978) 589 F.2d at 1098.

Appellee contended in the district court that Part III of Ruling 1975–12 was arbitrary and capricious. That contention has been impliedly rejected in the conclusion that it was a reasonable interpretative rule with a rational basis.

Appellee sought no formal opinion on its claim in this action, but appellee offered evidence that, on oral inquiry for guidance, appellee and some of its concerned members had been referred to state practice in counting commingled wells. Oklahoma had no parallel practice or problem. Nevertheless, in the only proven Oklahoma rule of practice conceivably relevant in the issuing of state "allowables" (allowances to produce crude oil), only one allowable was issued for commingled wells, while two allowables were issued for multiple completion wells. (Tr. 385.) It is questionable whether this evidence should be accorded any weight, but to the extent that it should, the evidence supports the appellant DOE rather than appellee.

Appellee further contends that Part III of Ruling 1975–12 violates the Fifth Amendment to the Constitution of the United States by depriving members of the appellee of due process of law. This contention is lacking in legal substance. *Mapco Inc. v. Carter* (Em.App.1978) 573 F.2d 1268, l.c. 1280–83. In this connection attention is invited to the provision of 10 C.F.R. § 205.50 permitting application for relief by members of appellee from serious hardship or gross inequity.

Part III of Ruling 1975–12 is in form and substance an interpretation of the preexisting "stripper well" statutory exemption and the preexisting regulation promulgated pursuant to the statutory authorization and mandate. It is purported to interpret, and did interpret, what in the opinion of the General Counsel for FEA, the statutory exemption and regulation always meant in the use of the term "well." Neither in form or substance did it expand or contract the meaning of the term "well" as used in the statute or regulation.

In summary, while the designation of Part III of Ruling 1975–12 as an interpretative rule by the FEA is not binding on the courts, an examination of the material statute, the legislative history, the regulation, and the rule demonstrates that it is interpretative, and expressly exempt from the notice and comment procedures of the APA, § 553(b) and (c), Title 5 U.S.C. This conclusion is supported by an opinion of this Court not available to the district court when its decision was rendered. See *Energy Reserves Group, Inc. v. Department of Energy, supra,* (Em.App.1978) 589 F.2d 1082, explained in *Duncan v. Theis, supra,* (Em.App. 1979) 613 F.2d 305.

*Reversal of Decision of District Court And Direction of Entry of Judgment Affirming The Validity of Applications of Part III of Ruling 1975–12*

Before the trial, the district court fully defined all the issues in the action below in a comprehensive pretrial order. (Tr. 23–33.)

A plenary evidentiary trial was held by the district court on all controverted issues, which were fully briefed. (Tr. 284–536; Exhibits 537–789; Confidential Data Volume II A.) Under these circumstances, if the record is sufficient for a final decision, there is no reason to remand the action for further proceedings. We find the record to be sufficient for final decision on the litigated issues, and uphold the action of FEA (and its successor DOE), applying Part III of interpretative Ruling 1975–12. In so doing we recognize that the interpretation of the underlying stripper well statutory exemption and regulation is not binding on this Court. *Energy Reserves Group, Inc. v. Department of Energy, supra,* (Em.App. 1978) 589 F.2d at 1093; 2 K. Davis, *Administrative Law Treatise* § 7.8, at 36–38 and § 7.13, at 59–64 (2d ed. 1979).

In determining whether there was a rational basis for the actions of the FEA in applying Part III of Ruling 1975–12 to commingled wells, the fundamental consideration is whether the statutory provision and

the legislative regulation defining the stripper well exemption authorized or permitted the actions of FEA in defining the term "well" in the stripper well exemption to forbid a commingled well to be more than one well. We are satisfied that Part III of Ruling 1975–12 was authorized and permitted by the underlying statutory provision and regulation. The definition in Part III of the interpretative ruling was not arbitrary or capricious. A rational basis existed for its adoption and was enunciated in the ruling. It was based on the similarities of multiple completion wells to two or more separate wells in isolating crude oil from each formation in separate tubing strings until it reaches the surface, maintenance of quality differences, additional capital expense and maintenance expense not required in commingled wells.

Commingled wells do not have these characteristics. The facts relied on for the basis of Part III of Ruling 1975–12 are supported by the evidence received in the trial by the district court.

■ In the House–Senate Conference Report on the original stripper well statutory exemption in the Trans–Alaska Pipeline Authorization Act (TAPAA), P.L. 93–153, 87 Stat. 576, Congress enjoined the administering agency that its regulations to be promulgated

> shall be so designed as to provide safeguards against any abuse, overreaching or altering of normal patterns of operations to achieve a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. (Footnote omitted.) [*Energy Reserves Group, Inc. v. Department of Energy, supra,* (Em.App.1978) 589 F.2d at 1109–10, quoting Conf.Rep. No.93–624, 93d Cong., 1st Sess., *reprinted in* (1973) U.S.Code Cong. & Admin.News, p. 2523, l.c. 2532.]

An interpretation of the statute and regulation was required on the method of counting of commingled wells. The interpretation in the challenged ruling was a reasonable choice of possible interpretations by the responsible administrative agency. It is not required that the interpretation be the only reasonable choice. *Udall v. Tallman,* 380 U.S. 1, l.c. 4, 85 S.Ct. 792, l.c. 795, 13 L.Ed.2d 616, l.c. 619 (1965), *Fulman v. United States,* 434 U.S. 528, l.c. 536, 98 S.Ct. 841, l.c. 846, 55 L.Ed.2d 1, l.c. 10 (1978).

■ In the absence of exceptional adverse circumstances this Court should defer to a reasonable exercise of expertise expressed in an interpretative rule by an administrative agency. 2 K. Davis, *Administrative Law Treatise, supra,* § 7.13, at 58–64 (2d ed. 1979); *Udall v. Tallman, supra,* 380 U.S. at 4, 85 S.Ct. at 795, 13 L.Ed.2d at 619 (1965); *Fulman v. United States, supra,* 434 U.S. at 536, 98 S.Ct. at 846, 55 L.Ed.2d at 10 (1978). This Court has recognized and applied this rule of deference in *Southern Union Production Company v. Federal Energy Administration* (Em.App.1978) 569 F.2d 1147, l.c. 1152; *Marathon Oil Co. v. Federal Energy Administration* (Em.App. 1976) 547 F.2d 1140, *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977); *University of Southern California v. Cost of Living Council* (Em.App.1972) 472 F.2d 1065, l.c. 1068–69; among many other cases.

■ In determining whether to defer to a reasonable interpretation of a statute, a regulation, or both, courts give extra authoritative weight to interpretative rules (1) which are made contemporaneously with the enactment of the statute, (2) which have been followed consistently over a long period, or (3) which were outstanding at the time of its reenactment. These three factors operate separately or in any combination. 2 K. Davis, *Administrative Law Treatise* § 7.14, at 64 (2d ed. 1979). Two of the three factors, (2) consistent application and (3) interpretation outstanding at the time of its reenactment, are present in this record of the history of Part III of Ruling 1975–12.

In the portion of its brief quoted hereinabove, appellee concedes the consistency of application of the challenged interpretation. This element of consistency, among other facts, distinguishes this case from *Standard Oil Co. v. Department of Energy* (Em.App. 1978) 596 F.2d 1029, relied upon by appellee.

Further, Part III of Ruling 1975–12 was outstanding on August 14, 1976, when the stripper well exemption was reenacted by § 121 of the Energy Conservation and Production Act of 1976, P.L. 94–385, 90 Stat. 1125, by amending the EPAA, 15 U.S.C. § 757(i). (The stripper well statutory exemption in force on August 29, 1975, when Ruling 1975–12 was issued had been repealed on December 22, 1975, by § 401 of the Energy Policy and Conservation Act of 1975, P.L. 94–163, 89 Stat. 871.) Reenactment of an underlying statutory provision, in substantially the same language, when an interpretative rule was outstanding has been recognized as a strong reason for deference to an interpretative rule defining the stripper well exemption by this Court in the *Southern Union Production Company* case, *supra*, (Em.App.1978) 569 F.2d 1147 and in the *Energy Reserves Group, Inc.* case, *supra*, (Em.App.1978) 589 F.2d 1082. We follow those cases on this appeal.

It is true that Part III of Ruling 1975–12 was not issued contemporaneously with the enactment of the stripper well exemption in the TAPAA or the EPAA in 1973. There is an interval of more than one year between the enactment of the EPAA and the issuance of Ruling 1975–12. However, deference should not be withheld on this ground when all other circumstances are favorable to deference by this Court.

In summary it is concluded that Part III of Ruling 1975–12 was and is a valid interpretative rule entitled to deference by the courts, in interpreting the statutory stripper well exemption and regulations.

The questions that we have decided up to this point, and the questions challenging Part III of Ruling 1975–12 submitted to the district court by the parties below are questions of law arising from the challenges of the appellee to the validity of Part III of Ruling 1975–12 as a proper interpretation of the underlying statutory stripper well exemption and the legislative regulation defining the statutory stripper well exemption.

Appellee undertook in the district court to offer oral and documentary evidence designed to transform the issues to issues of fact or mixed issues of fact and law. So far as the evidence exceeded that admissible on the issue of standing, on the uncontroverted factual industrial background desirable to an understanding of the meaning of the challenged rule, and on the effect of Part III of Ruling 1975–12 on a segment of the petroleum industry, it was largely immaterial to a decision on the legality of application of Part III of Ruling 1975–12 to members of the appellee producing crude oil from commingled wells.

Because the parties have been afforded a fair plenary evidentiary trial in the district court, the record is sufficient for a final decision. Therefore, for the reasons stated above, it is hereby

ORDERED that the judgment of the district court be, and it is hereby, reversed and remanded with directions. It is further

ORDERED that the district court be, and it is hereby, directed to enter judgment in favor of the defendant Department of Energy declaring that Part III of Ruling 1975–12, and its application to exclude counting of commingled wells as two or more wells, in applying the statutory stripper well exemption and regulations, is lawful and effective. It is further

ORDERED that the district court shall enter such other orders and judgments necessary or desirable to make restitution for the effects of orders of the district court and of the judgment of the district court heretofore entered which are inconsistent with this opinion and these orders.